**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-13222
Non-Argument Calendar
_____

PAUL GEORGE BETTENCOURT,

*Plaintiff-Appellant,*

*versus*

UNIT MANAGER DELISHA BRYANT,
   Individual and Official Capacity,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:23-cv-00114-WLS-ALS
_____

Before ROSENBAUM, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

Paul George Bettencourt appeals the dismissal of his 42 U.S.C. § 1983 claim alleging that Unit Manager Delisha Bryant violated his Eighth Amendment right to be free from cruel and unusual punishment.  Specifically, he argues that the district court erred when it held that Bettencourt did not abide by 42 U.S.C. § 1997e(a)'s mandate to exhaust all available administrative remedies before filing his lawsuit.  For the reasons discussed below, we affirm.[1]

## I.    FACTUAL AND PROCEDURAL HISTORY

Bettencourt is an inmate at Georgia's Valdosta State Prison ("VSP") on the twenty-sixth year of a sixty-year sentence for kidnapping, armed robbery, and aggravated sodomy.  He suffers from anxiety, depression, and paranoia and attempted suicide on multiple occasions.  When an inmate attempts to take his life at VSP, he is placed in the acute crisis unit ("ACU") for a period before being released back to the dormitories.  Because of his numerous suicide attempts, Bettencourt has been placed in the ACU multiple times throughout his sentence.

---

[1] On March 9, 2026, Bettencourt filed a motion to expedite oral argument.  We deny his motion as moot.  *See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000).

On January 13, 2023, VSP Unit Manager Delisha Bryant, at the direction of a mental health counselor, ordered that Bettencourt be placed in the ACU after he swallowed batteries in the hopes they would explode. Bettencourt's ACU cell was smeared with dried feces, blood, and other unidentified substances; his cell was cold because the window would not close properly and loud because of the HVAC unit outside his window. Bryant ordered that Bettencourt be given only a paper gown despite a mental health counselor requesting a smock, blanket, and mattress for Bettencourt during his ACU confinement. During his time in the ACU, Bettencourt was forbidden from having any sharp objects, including pens and pencils. Bettencourt was formally discharged from the ACU on January 30, 2023, but remained in the sharps-restricted unit until he was assigned a room on February 13, 2023.

When Bettencourt was in the ACU, a statewide grievance procedure was in place at the Georgia Department of Corrections and VSP. This grievance procedure allows an inmate to "file a grievance about any condition, policy, procedure, or action or lack thereof that personally affects the [inmate]." It requires an inmate to submit a hand-written grievance form no later than ten days from the date the inmate "knew, or should have known, of the facts giving rise to the grievance." The grievance is then screened by a VSP grievance coordinator who makes a recommendation to the warden.[2] The inmate may appeal the warden's decision within

---

[2] If the grievance is not timely filed, a grievance coordinator may waive the time limit for Good Cause. "Good Cause" is defined as "[a] legitimate reason

seven days of receiving it, or after forty days without hearing from the warden.

VSP's grievance procedure is not without restrictions. For example, an inmate is allowed two pending grievances at a time and may withdraw one of those grievances to file another, if he so chooses. Even so, VSP's grievance procedure states that "[n]o [inmate] may be denied access to this procedure" and "[i]nstitutional staff will assist [inmates] who need special help filling out the grievance forms (*i.e.*, due to language barriers, illiteracy, or physical or mental disability) upon request." Indeed, even inmates confined in the ACU have filed grievances in the past.

On February 21, 2023, Bettencourt filed two grievances. Grievance No. 349393 alleged that his shoes were stolen while he was in the ACU and were still not returned. The grievance was rejected as untimely on March 10, 2023, because Bettencourt discovered his shoes were stolen on January 18, 2023, but did not file his grievance until more than ten days later. Grievance No. 349390 alleged that his property was stolen while he was in the ACU. The grievance was rejected as untimely on March 16, 2023, because Bettencourt was able to retrieve his property on February 3, 2023, but did not file his grievance until more than ten days later. Review on appeal also rejected both grievances as untimely.

---

involving unusual circumstances that prevented the [inmate] from timely filing a grievance…. Examples include: serious illness, being housed away from a facility covered by this procedure (such as being out on a court production order or for medical treatment)."

On March 16, 2023, Bettencourt filed Grievance No. 350241, which grieved the conditions of his confinement in the ACU ("ACU Grievance"). Bettencourt explained that his grievance was late because he was limited to the two-grievance maximum and a grievance counselor had refused to take his grievance on March 13, 2023. The grievance was rejected as untimely because the incident occurred on January 13, 2023, when Bettencourt was admitted to the ACU, he did not file this grievance until March 16, 2023, and he could have dropped one of his other grievances to file the ACU Grievance. On appeal, Bettencourt reiterated that his grievance was late because he could file only two grievances at a time. Bettencourt's ACU Grievance was still denied as untimely.

On October 31, 2023, Bettencourt, proceeding pro se, sued Bryant under § 1983 alleging violations of the Eighth Amendment of the U.S. Constitution for the conditions of his ACU confinement. Following discovery, Bryant filed a motion for summary judgment arguing that Bettencourt's lawsuit should be dismissed because of his failure to exhaust available administrative remedies before bringing his § 1983 civil action in Federal court.

The magistrate judge recommended that Bettencourt's complaint be dismissed because Bettencourt's grievance was untimely and an inmate that files an untimely or otherwise procedur-

ally defective grievance does not satisfy the exhaustion requirement under 42 U.S.C. § 1997e(a).[3] Bettencourt alleged that he was not able to file a timely grievance because he was not allowed a writing utensil while in the ACU. But the magistrate judge determined that this did not mean that administrative remedies were unavailable. Specifically, the magistrate judge determined that Bettencourt did not establish that interference from prison officials rendered the grievance process incapable of use.

In adopting the magistrate judge's report and recommendation in full, the district court elaborated further on why Bettencourt failed to exhaust all available administrative remedies. Specifically, the district court noted that VSP staff could have assisted Bettencourt with filling out a grievance form upon request while he was in the ACU. Moreover, the grievance procedure's two-grievance maximum did not mean that administrative remedies were unavailable because Bettencourt had the option to withdraw a pending grievance and submit his ACU Grievance.

Bettencourt filed the present appeal.

## II.    STANDARD OF REVIEW

"We review a dismissal for failure to exhaust administrative remedies de novo" and "the district court's findings of fact related

---

[3] Pursuant to this Circuit's precedent, the magistrate judge properly considered Bryant's motion for summary judgment as a motion to dismiss. *See Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008).

to exhaustion for clear error." *McGuire-Mollica v. Fed. Bureau of Prisons*, 146 F.4th 1308, 1313 (11th Cir. 2025).

## III.    ANALYSIS

On appeal, Bettencourt raises the following two arguments for why the grievance process was not "available" to him: (1) he was restricted from using a pen and therefore unable to fill out a grievance form while in the ACU and (2) he could not fill out a grievance form about his experience in the ACU without first withdrawing his other grievances. But Bettencourt's reframing of the word "available" is not supported by Supreme Court precedent.

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [§] 1983 … by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To exhaust available administrative remedies, a prisoner must "complete the administrative review process in accordance with the applicable procedural rules," including deadlines. *Sims v. Sec'y, Fla. Dept. of Corr.*, 75 F.4th 1224, 1230 (11th Cir. 2023) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)); *see Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "[W]hen a state provides a grievance procedure for its prisoners," the "applicable procedural rules" are the "remedies available under that procedure[.]" *Varner v. Shepard*, 11 F.4th 1252, 1257 (11th Cir. 2021). Here, Georgia's statewide grievance procedures, adopted by VSP, dictate the administrative review process that must be complied with before filing a § 1983 action.

Baked into § 1997e(a)'s exhaustion requirement is an exception: "[a]n inmate need exhaust only such administrative remedies as are 'available.'" *Varner*, 11 F.4th at 1258 (citing *Ross v. Blake*, 578 U.S. 632, 648 (2016)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642.

In *Ross*, the Supreme Court enumerated "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 578 at 643. First, "administrative officials have apparent authority [to grant relief], but decline ever to exercise it." *Id*. For example, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id*. Second, "rules are so confusing that no reasonable prisoner can use them." *Id*. at 644. For example, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Or third, there is "interference with an inmate's pursuit of relief." *Id*. For example, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*.

Neither of Bettencourt's two arguments refuting availability are comparable to the circumstances enumerated in *Ross*. At all

times, VSP's grievance procedures remained "capable of use to obtain relief." *Id.* at 643.

First, VSP's grievance procedures were available to Bettencourt while he was confined in the sharps-restricted ACU. Those procedures provide that an inmate who needs special help filling out grievance forms would receive such assistance upon request. Proving this procedure was not so opaque that it was incapable of use, grievance counselors have received grievances from inmates detained in the ACU. The record does not indicate that Bettencourt made any attempts while in the ACU to file a timely grievance, that VSP personnel thwarted such attempts, or that VSP consistently refused to provide the sought after relief. *See Ross*, 578 U.S. at 644. Thus, Bettencourt failed to exhaust the remedies available to him while in the ACU.

Second, VSP's grievance procedures remained available to Bettencourt while he had two grievances pending review. "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 217. Here, the two-grievance limitation that Bettencourt complains of were defined by the prison grievance process itself. The record supports the district court's factual finding that Bettencourt was aware of the two-grievance limitation, and his option to withdraw one of the pending grievances to file another, because he has submitted more than sixty grievances while serving his sentence thus far.

Given Bettencourt's track record of submitting grievances, he had reason to know of the ten-day timeliness requirement as well.  So when Bettencourt filed his grievance about his shoes on February 21—34 days after they went missing—and his grievance about his property on February 21—18 days after his property allegedly disappeared—he had reason to know that both grievances were untimely at the times they were filed.  Under these circumstances, where Bettencourt should have known these two grievances were untimely—and without considering the potential merit of these two grievances—Bettencourt did not even arguably have a legitimate reason to avoid withdrawing one or both these grievances to allow him to file his ACU Grievance.[4]

Nor does the record show that VSP officers consistently declined to accept Bettencourt's withdrawal of his pending grievances or that VSP officers thwarted Bettencourt's participation in the grievance process.[5]  Thus, Bettencourt had an available avenue to exhaust his ACU Grievance according to VSP's grievance procedures, even if it would have required him to withdraw a pending grievance.  *See Ross*, 578 U.S. at 643-44.

---

[4]  Because Bettencourt did not exhaust his administrative remedies, we do not address the merits of his claim.  We note, however, that the Supreme Court has spoken against housing a prisoner in "deplorably unsanitary conditions for … an extended period of time."  *See Taylor v. Rojas*, 592 U.S. 7, 8–9 (2020).

[5] Even if Bettencourt filed his grievance on March 13, 2023, the day he alleges a grievance counselor refused to accept his ACU Grievance, it still would have been untimely.  *See Johnson v. Meadows*, 418 F.3d 1152, 1159 (11th Cir. 2005).

## IV.    CONCLUSION

For all these reasons, we conclude that the district court neither clearly erred in its factual determinations nor erred in determining that Bettencourt failed to exhaust the available grievance procedures.  We thus affirm the district court's judgment dismissing Bettencourt's § 1983 claim.

**AFFIRMED.**